UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

       Plaintiff,

v.

                                Criminal No. 14-20209

D-1 Demas Hernandez Cortez and    Honorable Sean F. Cox
D-2 Sarah Ann Calvetti,

       Defendants.
_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE (Doc. #18 and Doc. #22)**

In this action, Defendants Sarah Ann Calvetti (D2) ("Calvetti") and Demas Hernandez Cortez (D1) ("Cortez") (collectively, "Defendants") are charged in an Indictment (Doc. #10) with Conspiracy to Possess with Intent to Distribute and To Distribute Cocaine, Possession with Intent to Distribute More than 5 Kilograms of Cocaine, and Aiding and Abetting.

On May 11, 2014 and May 14, 2014, respectively, Defendants Cortez and Calvetti each filed a Motion to Suppress Evidence (Doc. #18 and Doc. #22). The Court held an evidentiary hearing and heard oral argument on the motions on July 8, 2014. Defendants' counsel requested leave to file supplemental briefs based on the testimony received at the evidentiary hearing. The Government filed its supplemental brief on July 30, 2014 (Doc. #32), and Defendants each filed a supplemental brief on August 4, 2014. (Docs. #33 and 34). For the reasons set forth below, the Court shall DENY Defendants' Motions to Suppress Evidence.

**BACKGROUND**

Defendants were indicted in this action on April 8, 2014. (Doc. #10). The indictment charges Defendants with Conspiracy to Possess with Intent to Distribute and To Distribute Cocaine,

in violation of 21 U.S.C. sections 846, 841(a)(1) and 841(b)(1)(A)(ii)(II); Possession with Intent to Distribute More than 5 Kilograms of Cocaine, in violation of 21 U.S.C. sections 841(a)(1) and 841(b)(1)(A)(ii)(II); and Aiding and Abetting, in violation of 18 U.S.C. section 2.  These charges follow a traffic stop and search of Defendants' vehicle as it was traveling northbound on I-75 through Monroe County, Michigan.

### Defendants' Motions to Suppress Evidence

On May 11, 2014, Cortez filed a "Joint Motion to Suppress Evidence." (Doc. #18).  On May 14, 2014, Calvetti also filed a "Joint Motion to Suppress." (Doc. #22).  In their motions, Defendants ask this Court to suppress evidence seized by Michigan State Trooper Craig Ziecina ("Trooper Ziecina") during the traffic stop because 1) Trooper Ziecina did not have probable cause to initiate a traffic stop of their vehicle, in violation of their Fourth Amendment rights; 2) even if Trooper Ziecina had probable cause to initiate a traffic stop of their vehicle, he impermissibly prolonged the duration of the stop beyond its initial purpose, in violation of their Fourth Amendment rights.

The Government's position is that 1) Trooper Ziecina had probable cause to initiate a traffic stop because Defendants committed the civil infractions of traveling under the speed limit and changing lanes without using a turn signal, and 2) Trooper Ziecina developed reasonable suspicion during the traffic stop that Defendants were engaged in criminal activity, so the duration of the traffic stop was permissibly extended beyond its original purpose.

### Evidentiary Hearing

With the issues so framed by the parties, the Court held an evidentiary hearing on July 8, 2014.  The Government presented two witnesses at the hearing: 1) Michigan State Trooper Craig Ziecina, and 2) Michigan State Trooper Jeffery Schrieber ("Trooper Schrieber").

The Government also offered twelve (12) exhibits into evidence: Government's Exhibit 3 - Video Recording of In-Car Activity Between Trooper Ziecina and Defendants; Government's Exhibit 4 - Photograph of Defendants' Vehicle; Government's Exhibit 5 - Photograph of Controlled Substances Found In Defendants' Vehicle; Government's Exhibits 6 and 7 - Michigan State Police Canine Certifications for Trooper Schrieber and K-9 "Booker"; Government's Exhibits 8 through 14 - Photographs Taken During Consent Search of Calvetti's Dearborn Heights, Michigan residence.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having observed the evidence and the witnesses who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.[1]

Trooper Craig Ziecina is a member of the Michigan State Police First District Hometown Security Team. This team is a criminal interdiction unit designed to make a high volume of traffic stops to identify criminals that are using Michigan's roadways.

On March 26, 2014 at about 12:30 p.m., Trooper Ziecina was monitoring traffic on northbound I-75 in Monroe County, Michigan. At that time, Defendants Calvetti and Cortez were traveling northbound on Interstate 75 in Monroe County, Michigan in a blue minivan. Calvetti was driving the vehicle, and Cortez was her only passenger.

As Trooper Ziecina was monitoring traffic, he observed Defendants' blue minivan bearing a Texas license plate quickly move from the left lane to the center lane without first using a turn

---

[1] To the extent that a finding of fact is more properly a conclusion of law, and the to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

signal. He also noticed that the driver of the vehicle had her arms outstretched rigidly and had a cold, expressionless look on her face.

After observing Defendants' vehicle change lanes without signaling, Trooper Ziecina pulled out of the median onto northbound I-75 and began following Defendants' vehicle. By "pacing" Defendants' vehicle, Trooper Ziecina determined that it was traveling at approximately 52 miles per hour. The minimum speed limit on I-75 in the Monroe County, Michigan area is 55 miles per hour.

Once Trooper Ziecina had paced Defendants' vehicle for about a mile, he activated his emergency lights and initiated a traffic stop of Defendants' vehicle. Trooper Ziecina approached the passenger side of Defendants' vehicle where he then made contact with Defendants. Trooper Ziecina asked Calvetti, who was driving the vehicle, for her driver's license and vehicle paperwork. Calvetti produced the vehicle paperwork but not her driver's license, and told Trooper Ziecina that she had left her license in her purse at a restaurant.[2]

Trooper Ziecina asked Calvetti to exit her vehicle and follow him to the patrol vehicle so that he could attempt to identify her. She complied. Cortez remained in the passenger seat of the minivan at this time.

Once Trooper Ziecina and Calvetti entered the patrol car, its internal audio and video system was activated. Thus, Trooper Ziecina and Calvetti's entire conversation inside the patrol car is recorded.

During their initial conversation, which last about nine (9) minutes, Trooper Ziecina asked Calvetti a series of questions regarding her identity, her travel plans, her vehicle, etc. Calvetti informed Trooper Ziecina that she was moving from Texas to Dearborn Heights, Michigan, that she

---

[2] Calvetti's purse was later found under the driver's seat along with her driver's license.

4

was traveling with her boyfriend, Cortez, and that she drove a total of twenty-four (24) straight from Texas to Michigan without resting.

Trooper Ziecina then exited the patrol car and went to speak with Cortez. Trooper Ziecina noticed that there were very few personal belongings inside the minivan, despite Calvetti's statement that she was in the process of moving to Michigan from Texas.

Trooper Ziecina soon returned to the patrol car where he questioned Calvetti about the ownership of the vehicle. He noted that the vehicle paperwork indicated that the minivan was owned by someone else, at which point Calvetti stated that she was in the process of purchasing the vehicle from a friend, but had not yet completed the sale.

Trooper Ziecina also questioned Calvetti about Cortez's residence and work status. She responded that he was a truck driver and would be moving to Michigan with her. Trooper Ziecina then asked Calvetti if she was responsible for all of the vehicle's contents, and she said that she was. Trooper Ziecina requested Calvetti's permission to search the vehicle. Calvetti responded that Trooper Ziecina could search the vehicle, but that it had already been searched in Mississippi. At this point, the traffic stop had lasted for about fifteen (15) minutes.

Trooper Ziecina then exited the patrol car, and Trooper Schrieber conducted a canine sniff of the vehicle. Trooper Ziecina returned to the patrol car about three minutes later and asked Calvetti whether she had ever been arrested. She responded that she had been arrested, but not for any felonies. She did admit, however, that Cortez had a felony drug charge involving roughly fifty (50) pounds of marijuana. She also stated that Cortez smokes "weed," or marijuana. She said that Cortez had been incarcerated for eighteen (18) years, and made a comment about him having been involved in a shootout. She also said that she had been placed on probation for a prior drug

conviction.

Calvetti asked Trooper Ziecina about the speed limit on I-75, saying that she thought she was traveling at sixty-five (65) miles per hour. Trooper Ziecina told her "you were doing fifty-five (55), but you were in the center lane, so you had vehicles traveling around you. If you're going to travel 55, move over to the right lane so you're not impeding traffic."

Throughout Trooper Ziecina's interactions with Calvetti, he noticed that she acted nervously. For example, Trooper Ziecina noticed that she did not make eye contact, she was sweating and shaking, she touched her face, and she "searched for answers" to simple questions. Calvetti's nervous mannerisms and behaviors are also visible on the in-car video.

Approximately thirty-five (35) minutes into the traffic stop, Cortez was removed from the minivan and placed in the rear passenger seat of the patrol car. Calvetti remained in the front passenger seat of the patrol car. Trooper Ziecina and Trooper Jeffery Schrieber began searching the vehicle.

Trooper Ziecina noticed several "discrepancies" involving the construction of the minivan. First, it had a wheelchair and wheelchair lift, but the wheelchair was covered in dust and did not appear to have been used for some time. The floor of the van appeared to have been altered. Trooper Ziecina saw visible sheet metal near the driver's side sliding door of the van.

Based on these observations, Trooper Ziecina suspected that the floor of the van was being used as a "trap" to store contraband. He decided to use an optical scope to view hidden areas of the van floor.

Trooper Ziecina placed the optical scope inside of an opening in the floor of the van, and could see areas where the floor had been welded. He and Trooper Schrieber were then able to pry

6

open the center portion of the floor to insert the scope. Through the scope, Trooper Ziecina and Trooper Schrieber observed wrapped plastic packages stored inside the trap floor of the van.

With the help of Cortez, Trooper Ziecina opened up the trap floor and found sixteen (16) kilograms of what was later determined to be cocaine. Defendants were placed under arrest and taken to the Detroit Field Office of the Drug Enforcement Administration ("DEA") for questioning. The total duration of the traffic stop before Defendants were arrested, including the search of Defendants' vehicle, was approximately one hour and fifteen minutes. Trooper Ziecina did not issue either Defendant a traffic citation.

## CONCLUSIONS OF LAW

The Fourth Amendment's protection against unreasonable searches and seizures applies in the context of traffic stops. *U.S. v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012). In other words, a vehicle stop constitutes a seizure for Fourth Amendment purposes. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).

"In order to effect a traffic stop" without offending well-accepted Fourth Amendment principles, "an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *Lyons*, 687 F.3d at 763, *citing Gaddis v. Redford Township*, 364 F.3d 763, 771 n.6 (6th Cir. 2004). An officer's traffic stop based on probable cause that a civil infraction has been committed is legal, regardless of the officer's subjective motivation for the traffic stop. *Whren v. U.S.*, 517 U.S. 806, 812-13 (1996). However, if the initial traffic stop is illegal, then any evidence seized during a search of the vehicle must be suppressed. *Id.*, *citing U.S. v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).

    **A.**    **The Initial Traffic Stop Was Lawful Because Trooper Ziecina Had Probable**

**Cause To Believe That Defendants Committed A Civil Infraction.**

Neither party claims that Trooper Ziecina initiated the traffic stop due to reasonable suspicion of ongoing criminal activity. Thus, the issue becomes whether Trooper Ziecina had probable cause to believe Defendants committed a civil infraction.

Based on Trooper Ziecina's credible testimony, the Court finds that Trooper Ziecina witnessed Calvetti's failure to use her turn signal as she changed lanes on I-75. It is undisputed that changing lanes without signaling on a highway constitutes a civil infraction under Michigan traffic safety law. *People v. Hrlic*, 277 Mich. App. 260, 266 (2007), *interpreting* M.C.L. § 257.648.[3] Therefore, the initial traffic stop was lawful because Trooper Ziecina had probable cause to believe that Defendants had committed a civil infraction, to wit, changing lanes without signaling.[4] This Court shall DENY Defendants' Joint Motions to Suppress Evidence to the extent that they rely on the illegality of the initial traffic stop.

**B.** **Trooper Ziecina Did Not Unreasonably Extend The Duration Of The Traffic Stop Because He Developed Reasonable Suspicion Of Criminal Activity During The Traffic Stop.**

---

[3] M.C.L. § 257.648 states, in pertinent part, that "(1) The operator of a vehicle or bicycle upon a highway, before stopping or turning from a direct line, shall first determine that the stopping or turning can be made in safety and shall give a signal as required in this section . . . (2) Except as otherwise provided in subsection (5), a signal required under this section shall be given either by means of the hand and arm in the manner specified in this section, or by a mechanical or electrical signal device that conveys an intelligible signal or warning to other highway traffic . . . . (6) A person who violates this section is responsible for a civil infraction." M.C.L. § 257.648.

[4] The parties dispute whether Defendants were driving under the posted speed limit of 55 miles per hour, which is also a civil infraction in Michigan. *See* M.C.L. § 257.628. Because the Court finds that Defendants changed lanes without signaling, in violation of M.C.L. § 257.648, the Court need not decide whether or not Defendants were also driving under the minimum speed limit.

Once an officer initiates a lawful traffic stop based on probable cause to believe a traffic violation has occurred, the traffic stop must only last long enough to effectuate the purpose of the stop. *U.S. v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010), *citing Florida v. Royer*, 460 U.S. 491, 500 (1983). The Sixth Circuit has stated that "the proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*—including any prolongation due to suspicionless unrelated questioning—was reasonable." *United States v. Allen*, 2010 WL 5348897 (E.D. Tenn. Dec. 21, 2010), *aff'd sub nom. United States v. Crawley*, 526 Fed. App'x 551 (6th Cir. 2013), *citing United States v. Everett,* 601 F.3d 484, 494 (6th Cir.2010).

A law enforcement officer does not unreasonably prolong a stop by asking the detained motorist extraneous questions not related to the stop, as long as the questioning does not unnecessarily prolong the detention and the detainee's responses "are voluntary and not coerced." *U.S. v. Aguilera-Pena*, 426 Fed. App'x 368, 370 (6th Cir. 2011). A traffic stop is not made unreasonable when an officer asks a detained motorist for consent to search the vehicle. *Id.*, *citing Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *U.S. v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003). Further, if the use of a drug-sniffing dog does not unreasonably extend the length of a traffic stop, no Fourth Amendment rights are implicated. *Illinois v. Caballes*, 543 U.S. 405 (2005).

After the purpose of the traffic stop is completed, the officer must have a "reasonable and articulable suspicion that criminal activity [is] afoot" in order to further detain the motorist. *U.S. v. Hill*, 195 F.3d 258, 263 (6th Cir. 1999), *citing U.S. v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (*en banc*); *Aguilera-Pena*, 426 Fed. App'x at 370. Reasonable suspicion is based on the totality of the circumstances and requires "articulable reasons" and "a particularized and objective basis for suspecting the particular person . . . of criminal activity." *Joshua v. DeWitt*, 341 F.3d 430, 443 (6th

9

Cir. 2003), *quoting United States v. Cortez,* 449 U.S. 411, 417–18 (1981).

The Court finds that Trooper Ziecina did not unreasonably prolong the traffic stop beyond its initial purpose because, due to the totality of the circumstances of the stop, he developed reasonable suspicion that Defendants might be engaged in criminal activity. Several factors support this conclusion.

First, Calvetti caught Trooper Ziecina's attention because she was driving a minivan with an out-of-state license plate, slower than the flow of traffic, and because she quickly changed lanes without signaling as she passed Trooper Ziecina's marked patrol car.

Next, Defendants' alleged travel plans were not corroborated by Trooper Ziecina's observations. Calvetti stated that she was in the process of moving to Michigan, yet had few personal belongings in the vehicle.

Moreover, Calvetti stated that the vehicle and all of its contents belonged to her. Yet, when Trooper Ziecina asked Calvetti why the vehicle was registered to someone else, she backtracked and said that she was in the process of purchasing it but had not yet completed the sale.

Calvetti also told Trooper Ziecina that Cortez had a prior conviction for possession of nearly fifty pounds of marijuana, that Cortez smokes marijuana, and that he had been incarcerated for eighteen (18) years for another crime. Calvetti also admitted that she had been placed on probation in the past for a drug charge.

Finally, Calvetti appeared and acted nervously throughout her entire encounter with Trooper Ziecina. She was jittery, sweaty, and hesitated when answering even basic questions. *See* In-Car Video Recording, Gvmt. Ex. 3, When she drove past Trooper Ziecina's vehicle, she had her arms rigidly outstretched on the steering wheel and had a cold, blank stare on her face. Even if the

average individual would experience some amount of anxiety during a traffic stop, the Court finds that Calvetti's displays of nervousness went beyond what could be considered normal during a routine traffic stop.

Based on Defendants' statements and conduct, Trooper Ziecina was reasonably suspicious that Defendants were not being truthful about the reasons for their non-stop, 24-hour drive from Texas to Michigan. The Sixth Circuit's opinion in *U.S. v. Stepp* supports this Court's conclusion. *U.S. v. Stepp*, 680 F.3d 651 (6th Cir. 2012).

In *Stepp*, defendants were pulled over because their license plate was not registered to their rental vehicle. *Stepp*, 680 F.3d 651, 657. Officers noticed that defendants were nervous, pretended to be asleep when the officers approached the car, did not have a rental agreement for the vehicle, did not know who owned the vehicle, were not listed as authorized drivers for the rental vehicle, had dubious travel plans, and had previous narcotics convictions. *Id.* at 664. The district court held that these factors, when combined, created reasonable suspicion that defendants were engaged in criminal activity. *Id.*

The Sixth Circuit affirmed the district court's conclusion. *Id.* at 667. The Sixth Circuit noted that although some factors like nervousness, driving a rental car, failing to produce a rental car agreement, and pretending to be asleep when officers approached are all relatively weak indicators of criminal activity, they may "support[] the existence of reasonable suspicion" when "combined with the occupants' past history of narcotics activity and their vague travel plans . . . ." *Id.* at 665.

Those same suspicious factors are present here. Calvetti was visibly nervous, both Defendants had prior drug convictions, and Defendants' travel plans appeared dubious. While other circumstances of the traffic stop may at first appear to be innocent, such as Calvetti's confusion

about her ownership of the minivan or her initial inability to produce a driver's license, they appear more nefarious when considered in combination with the other facts.

Based on the foregoing, the Court holds that Trooper Ziecina had reasonable suspicion based on articulable facts that justified his prolongation of the traffic stop beyond its initial scope. Trooper Ziecina did not violate Defendants' Fourth Amendment rights, and this Court therefore DENIES Defendants' Joint Motions to Suppress (Docs. #18 and #22).

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendants' Joint Motions to Suppress Evidence (Doc. #18 and Doc. #22) are DENIED.

**IT IS SO ORDERED.**

> S/Sean F. Cox
> Sean F. Cox
> United States District Judge

Dated: September 4, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 4, 2014, by electronic and/or ordinary mail.

> S/Jennifer McCoy
> Case Manager